Suttatip Vechvitvarakul,      :  Case No. 1:10-cv-114

      :

    Plaintiff,      :

      :

vs.      :

      :

The Health Alliance of Greater    :

Cincinnati, et al,      :

      :

    Defendants.      :

**ORDER**

Before the Court is the joint motion for summary judgment filed by all of the Defendants: the Health Alliance of Greater Cincinnati, Inc.; University Hospital, Inc.; the University of Cincinnati College of Medicine; and Dr. Amy Reed. (Doc. 77) Plaintiff opposes the motion (Doc. 80), and the Defendants have filed a joint reply. (Doc. 82) For the following reasons, the Court will grant Defendants' motion.

**FACTUAL BACKGROUND**

Plaintiff Suttatip Vechvitvarakul was born and raised in Thailand. She attended medical school and completed a four-year surgical residency at Srinagarind Hospital in Khon Kaen, Thailand. She then worked as an attending physician and as a general surgeon at two hospitals. Dr. Vechvitvarakul wanted to gain additional training in the United States, and to become board-certified in surgery in this country. She applied to and

was accepted for a one-year general surgery residency at Harlem Hospital Center in New York City, and completed her general surgery residency at Montefiore Medical Center. She became board certified in general surgery in October 2008.

Dr. Vechvitvarakul then decided to pursue a surgical specialization in vascular surgery, which would require an additional two years of fellowship training and successful completion of a specialized examination. She applied to several training programs, including the University of Cincinnati's vascular fellowship program, through the national "match" system for post-graduate medical training. The fellowship program is sponsored and funded by University Hospital, which at the time of these events was a part of the Health Alliance of Greater Cincinnati. (The Alliance is now known as UC Health.) The University of Cincinnati College of Medicine is responsible for developing the fellowship program, and training and supervision of the fellows is done by UC vascular surgery faculty members. According to Dr. Amy Reed, who was at the time the program director for UC's vascular surgery training programs, UC receives approximately 50 to 60 applications for their fellowship program each year. The faculty choose 15 to 20 candidates for personal interviews, and then provides the match program with a list of their ranked choices. Applicants to all of the post-graduate training programs also rank their choices of programs, and the

national match system's computers use the rankings to match candidates and programs. The UC fellowship program accepts one fellow per year, and in March 2007 Dr. Vechvitvarakul was informed that she had "matched" to the UC Program, to begin in July 2008.

Following her acceptance, Dr. Vechvitvarakul signed a Graduate Medical Education Contract ("GME Contract") governing the terms of her appointment to the program. The contract's term is for twelve months, expiring on June 30, 2009. By signing the contract, Dr. Vechvitvarakul acknowledged that she read and agreed to the terms of the 2008/2009 GME Agreement attached to the GME Contract. (Vechvitvarakul Deposition Ex. 4) Section 4.2 of the Agreement requires the hospital to provide written notice of its intent to renew the contract for another term no later than 120 days before the termination date of June 30, 2009. It further states:

> Any such contract renewal is dependent on Resident's continued satisfactory performance in meeting the training program requirements and the terms and conditions of this Agreement. If Resident's performance is deemed by the Residency Program to be unsatisfactory ... , this Agreement and the GME Contract may be terminated at any time, written notice of intent to renew notwithstanding. In this regard, Resident acknowledges that formal evaluations are conducted approximately every six months, ... and that such evaluations may be an occasion for considering whether this Agreement and the GME Contract should be terminated.

The Agreement sets forth the disciplinary and appeal procedures available to a resident in the event that performance is found to be unsatisfactory.  Finally, the GME Contract states: "Continuing participation in the Residency Program is contingent upon Resident's successful progress through the Residency Program. This Agreement may be terminated by Hospital at any time for grounds specified in the 2008/2009 GME Agreement."

On August 19, 2008, Dr. Reed met with Dr. Vechvitvarakul to review her first six weeks in the program.  The meeting was prompted by faculty members' concerns about Dr. Vechvitvarakul's performance and patient care.  As Dr. Reed testified, the faculty and the vascular group were

> ... expressing concern about her abilities to
> care for patients and not really seeming to
> understand what was going on with the
> patients and difficulty in knowing varying
> things that had happened to the patients. ...
> There was concern about her performance with
> showing up [on] time.  So showing up late to
> the procedures, and that coupled with lack of
> knowledge of what - the background of the
> patient, what was going on with the patient
> made all of our faculty, myself included,
> very concerned about her performance and how
> she was going to do.

(Reed Deposition at 105-106)  Dr. Reed described several occasions, including scheduled surgeries, for which Dr. Vechvitvarakul was late.  The attending physicians "would never be able to get out of her an explanation or what was - why she was late to multiple conferences, some of which she was

presenting." Dr. Reed described growing concern among the faculty because Dr. Vechvitvarakul had "just started July 1st, and we're already having to sit down [with her] in August. It's concerning because the faculty are sensing a problem compared to years past." (Reed Deposition at 107-109)

Dr. Reed's typed notes of the August 19 meeting state that there "... have been some faculty concerns with regard to her decision making and ability to run the vascular service as well as show up on time in the OR and angio suite." Dr. Vechvitvarakul explained to Dr. Reed that she was getting acclimated to University Hospital, and that procedures had been different in her prior residencies. Dr. Reed and Dr. Vechvitvarakul discussed the need "for improved professionalism - no scrubs for M&M [morbidity and mortality conferences], grand rounds and office." Dr. Reed believed Dr. Vechvitvarakul was "an intelligent motivated individual. She understands the issues and will work on them. We will meet again in two weeks to reassess how things are coming along. I encouraged her to call or stop in at any time with any concerns." (Reed Deposition Ex. 14)

After this meeting, Dr. Vechvitvarakul's performance continued to cause the attending physicians concern about her competence in core areas. Dr. Reed described feedback she received from faculty members about difficulties they were having with Dr. Vechvitvarakul's verb conjugation, "... which can be

very challenging if you're talking about if somebody is bleeding, if they bled, if they're bleeding right now. You could imagine it could be - it can be a big dilemma and difficult. As vascular surgeons, we deal with bleeding issues. And so people were saying it was difficult to understand her sometimes description of that." (Reed Deposition at 117) Dr. Giglia testified that the first time he was on call with Dr. Vechvitvarakul, he had concerns about her ability to transfer important information: "I couldn't understand the woman. ... some of what we do is dealing with chronic disease, other times we're dealing with emergency situations where time is sort of important. I couldn't tell if she was telling me there was a patient with ruptured aneurism, someone who had a ruptured aneurism, someone that previously had a ruptured aneurism, someone who she was concerned might have had a ruptured aneurism, someone who's family member had a ruptured aneurism. I had a lot of trouble finding out what the clinical situation was that we were dealing with." (Giglia Deposition at 30) Dr. Meier said his concerns arose almost immediately, and centered on patient care issues: "... she couldn't tell when a patient was sick. So there were several occasions where literally I had to come in from home when she was on call because I - talking to her on the phone I could not tell whether the patient had an illness that needed surgery or not. ... She couldn't answer my questions in a coherent fashion so that I

could be convinced. ... I would ask questions and the answers
that I got did not make clinical sense." (Meier Deposition at
33, 37)

Drs. Reed, Meier, and Giglia attended weekly faculty
meetings during which trainees' performance was discussed. Dr.
Reed testified that by mid-September, the faculty had decided to
issue a letter of deficiency to Dr. Vechvitvarakul. The
September 26, 2008 letter (Vechvitvarakul Dep. Ex. 15) identified
concerns about her performance in five "core competency" areas:
patient care; medical knowledge; practice-based learning and
improvement; communication skills; and professionalism. The
letter, signed by Dr. Reed, also set forth some specific steps
that Dr. Vechvitvarakul must take to address some of these
concerns. If the performance deficiencies were resolved, Dr.
Vechvitvarakul would remain in the program. Her failure to cure
them, however, could result in a new deficiency letter, a lack of
promotion to the next training level, an extension of her
training period, or her dismissal from the program. The specific
steps required were for Dr. Vechvitvarakul to attend six sessions
with a language coach (paid for by the program); her in-person
attendance for all after-hours consults; compliance with the 80-
hour work week; and a requirement for her to actively work "on
becoming the leader of the vascular surgery team as is expected
of a surgeon at your level. You will present at vascular

educational conference and at every journal club. [sic]  It is expected that you will be on time for every vascular case, having read the chart and looked at old operative reports.  On time arrival at conferences is also expected." Dr. Reed closed the letter by stating it was her hope that the performance deficiencies could  be resolved and Dr. Vechvitvarakul's "dream of becoming a vascular surgeon can be a reality."

Dr Vechvitvarakul attended the six language classes.  The instructor reported to Dr. Reed on November 9 that while Dr. Vechvitvarakul was a pleasure to work with and eager to learn, she had trouble communicating ideas:

> She does not understand the different use of tenses which can be critical in medicine. For example, she does not recognize the difference between something being swollen, was swollen, or is swelling.  It is difficult for her to distinguish the past and present tense of verbs.  Her sentences are well structured but often lack verb agreement, as her language acquisition was self taught. ... She would need to go back to basic level English in order to correct some of the habits she has acquired.

(Vechvitvarakul Dep. Ex. 25)

Dr. Reed did not have a formal monthly meeting with Dr. Vechvitvarakul in October or in November to review the deficiency letter.  Drs. Reed, Giglia and Meier all testified that the primary avenue of feedback and evaluation in the training program was the daily interaction they had with Dr. Vechvitvarakul about the care of patients on the service.  Dr. Andrew Filak, Senior

Associate Dean for Academic Affairs at UC who oversees all of the GME programs at the University, testified that trainee evaluation occurs daily, weekly, and/or monthly, as "Faculty are reviewing them at all times." (Filak Deposition at 34) These evaluations can be oral, written, or a combination of methods.

By late November or early December, the vascular surgery faculty reached a conclusion that Dr. Vechvitvarakul would not be able to successfully complete the fellowship. According to Dr. Reed, they discussed how to handle that decision, given Dr. Vechvitvarakul's visa status and any potential patient care ramifications. (Reed Deposition at 175-177) The faculty members also completed written evaluations of Dr. Vechvitvarakul during the first week of December. Most of her rating scores were in the below adequate range; written comments provided by the faculty members include the following:

> "greatest weakness is her clinical judgment. She cannot formulate a clinical plan...";

> "has knowledge, but cannot apply it;"

> "lateness is a problem. English language is a problem."

> "Has a difficult time with collection, synthesis and presentation of information"

> "unable to present a clear picture of a patient's clinical condition"

> "has a difficult time with catheters and guidewires. Basic concepts have not been mastered."

"Unable to effectively communicate what is
currently happening with the patients.  I
cannot tell if someone is sick based on her
presentation."

"Lacks plan direction and ability to piece
together history to establish a plan."

"Has difficulty communicating with team
members and patients."

"Has had some difficulty assimilating into a
new system and needs detailed supervision."

"Limited communication abilities and has a
big problem with language barrier."

"Sue [Dr. Vechvitvarakul] has a difficult
time synthesizing data on vascular problems
and presenting it.  She is often unable to
come up with a treatment plan."

"After five months of immersion into
precutaneous and open vascular surgery, she
is still unable to verbalize steps beyond
putting a catheter into an artery.  She
cannot state what wire to use next or even
when and if patient should receive heparin."

"Despite language coach, does not understand
certain key medical verbs and how to use them
like swelling and swollen."

(Vechvitvarakul Dep. Exs. 17, 18)  Dr. Meier testified that his

evaluation was "pretty dismal," and that he could not recall

giving an evaluation of any other resident in his career that was

as negative.  (Meier Dep. at 67)  Dr. Giglia testified that he

"couldn't understand what information she was trying to convey to

me, and I wasn't sure that she understood the information that I

conveyed to her, and it made taking care of complex patients

impossible."  (Giglia Dep. at 41)  Dr. Reed's evaluation

-10-

concluded that Dr. Vechvitvarakul had demonstrated below adequate performance, and that she would be unable to advance to the next level.

The faculty also discussed how to terminate Dr. Vechvitvarakul from the program, by either an immediate dismissal or some other option that would not create visa problems for her. Dr. Meier testified that he discussed this issue with Dr. Vechvitvarakul, who made it clear to him that she did not want to go back to Thailand and wanted to remain in the United States and find another job with an institution that could sponsor her. The faculty decided to allow her to work at the VA hospital with Dr. El-Sayed (a vascular surgery faculty member), who volunteered to directly supervise her. Dr. Vechvitvarakul was also relieved of on-call responsibilities. (Meier Dep. at 70-71)

Dr. Reed met with Dr. Vechvitvarakul on December 16 to inform her of the faculty's decision and review her evaluations. Julie Gulley, the program coordinator, also attended the meeting. Dr. Vechvitvarakul signed the six-month evaluation on that day, acknowledging that she received and read it. (Vechvitvarakul Dep. Ex. 18) Dr. Reed's written summary of that meeting states that Dr. Vechvitvarakul asserted that her performance had been improving. Dr. Reed noted that they

> ... discussed that she does not seem to be
> aware of the seriousness of situations in
> both clinical care of patients and
> interactions with faculty. ... There appears

to be a disconnect with what is being told to
her and the seriousness of the situation.
This has been a repetitive pattern in her
interactions with faculty and patients.  She
has continually been unable to clinically
assess if a patient is doing well or poorly.
Likewise though it is explained to her
verbally and in writing about her poor
performance, she chooses to ignore these
warnings and continues to go about her usual
ways.

They also discussed options

that might allow Su to exit the program
without extreme hardship.  She has a J1 visa
and is able to remain in the country until
June 30, 2009, after which she would need to
return to Thailand unless she has found
another training program in vascular surgery
in the United States or has obtained a waiver
for general surgery position.  I suggested to
Su that she consider finding a job in General
Surgery which appears to be her strength.
Given the difficulties she has had here with
self-awareness, perception and English
language, it may be best for her to return to
her home country of Thailand.

The notes also confirm that as of January 1, 2009, she would

begin work at the VA hospital "while she figures out her next

steps." (Vechvitvarakul Deposition Ex. 19)

Dr. Vechvitvarakul's own notes (what she described as "short

notes" or journals) for December 16 state: "I received an

official letter from Dr. Reed.  Next Monday, I will start working

in vascular service in the VA hospital and take call there."[1]

_____

[1] It is unclear what letter Dr. Vechvitvarakul is referring
to.  Dr. Reed signed her typed summary of the December 16
meeting, but there is no testimony that a copy was given to Dr.
Vechvitvarakul.

She also made a "short note" for December 17, stating that "Dr. Reed was acting very hostile in the OR today, pulling wire out of my hands. .... Between the 2nd and 3rd case, she called me to the patient waiting room. There is no one there. She told me that I should go back to Thailand. She did it again. Yesterday, when there was Julie as a witness she said I would rotate to the VA hospital and today with no witness she forced me to go back to Thailand. She would tell everyone that I did not understand English again." (Vechvitvarakul Ex. 50)

Dr. Vechvitvarakul met again with Dr. Reed on December 31, as they had agreed to do on December 16. Dr. Reed asked Dr. Vechvitvarakul to take the month of January off for vacation "and time to consider a position elsewhere as a General Surgeon staff. We discussed that perhaps time as an attending surgeon will help hone her clinical skills to the point that she may be able to re-enter a vascular surgery fellowship in the future if she so chooses. If this does occur, it is my opinion that she would need to start at the beginning of a two year fellowship given her performance here." (Vechvitvarakul Ex. 20) Dr. Reed again confirmed that she would work at the VA Hospital through June 30, 2009, unless she found another position prior to that time.

Dr. Vechvitvarakul appealed the decision to terminate her from the program under the procedures contained in the GME Agreement. Dr. Filak appointed Dr. Greg Rouan from the

Department of Internal Medicine to perform the first-step review, pursuant to Section 4.1.5 of the Agreement. (Vechvitvarakul Ex. 33) Dr. Vechvitvarakul met with Dr. Rouan on February 26 and presented her reasons why she should not be terminated. She followed that meeting with a March 2 letter stating that from September 26 (the date of Dr. Reed's deficiency letter) through December 15, when she was informed she would be terminated, "I received no feedback. As a result, I believed that I was performing at a satisfactory level." She stated that the failure to provide feedback in a timely fashion deprived her of the opportunity to correct or improve her performance. She told Dr. Rouan that she did everything that Dr. Reed had required of her, and had been late only one time to a conference with Dr. Meier, caused by an emergency. Her letter also stated her belief that she was treated less favorably than other residents, which she surmised may be attributable to "communication issues associated with my accent. ... It may be that it takes greater effort for some on the staff to clearly understand me. Yet in other situations [in prior training], I succeeded with the same level of proficiency in the English language that I have now. Accordingly, I am concerned that the Administration has downgraded my performance because of the perception that I cannot learn or communicate effectively on account on my accent." (Vechvitvarakul Ex. 35) She admitted that she did not complain

about any discriminatory treatment prior to the decision to terminate her from the program. (Vechvitvarakul Dep. at 174-75)

Dr. Rouan concluded that her appeal lacked merit, and that he could find no basis for finding that she had been treated differently than other residents in the program. (Vechvitvarakul Ex. 37) Dr. Rouan noted that Dr. Reed did not document monthly feedback with Dr. Vechvitvarakul as she said she would do in the September deficiency letter. But Dr. Rouan was "told that [Reed] did provide this feedback on a variety of occasions." He also concluded that the "reason for the presumption on Dr. Vechvitvarakul's part that she cured deficiencies in her performance is not readily apparent to me. Based upon my conversation with Dr. Reed it is clear that both she and the faculty believe that Dr. Vechvitvarakul's performance remains unsatisfactory and thus the basis for the non-reappointment outcome." (Id. at 2)

Dr. Vechvitvarakul then requested a final review of the decision by a three-physician panel, as provided by the GME Agreement. Dr. Filak asked faculty members Drs. Deledda (emergency medicine), Ollendorff (Ob/Gyn), and Neel (neurology) to comprise the panel. (Dr. Deledda was unable to participate, and Dr. Bennett from the Department of Psychiatry substituted for him.) Dr. Filak's April 3 letter to Dr. Vechvitvarakul identified the panel members, and stated that the "purpose of the

review panel will be to determine if you received sufficient notice and opportunity to cure any deficiencies and the reasonableness of the decision." (Vechvitvarakul Ex. 40) Dr. Vechvitvarakul requested the opportunity to speak with the panel, and objected to what she described as Dr. Rouan's improper reliance upon Dr. Reed's version of events. (Vechvitvarakul Ex. 41) The panel met with Dr. Vechvitvarakul and Dr. Reed on April 17, and after the meeting, the panel rejected the appeal. Dr. Bennett's letter to Dr. Filak states: "It is the opinion of the panel that Dr. Vechvitvarakul does not fully understand the nature or the gravity of the deficiencies despite the repeated attempts to communicate these to her verbally and in the Letter of Deficiency." (Vechvitvarakul Ex. 42)

Dr. Vechvitvarakul secured a position with the VA Hospital in Marion, Illinois as a physician/general surgeon starting in September 2009, with an annual salary of $240,000. (Vechvitvarakul Ex. 48) She remained in that position at the time of her June 6, 2011 deposition.

Dr. Vechvitvarakul filed an EEOC charge on or around June 15, 2009, alleging that Defendants' decision to give her low performance ratings and terminate her were based upon her national origin. (Vechvitvarakul Ex. 27) After receiving a right to sue letter, she filed her original complaint in this Court on February 22, 2010. (Doc. 2) The operative Second

Amended Complaint (Doc. 44) contains six claims. Count One is brought under Title VII against the Health Alliance and University Hospital. Count Two alleges breach of the GME Contract against the same defendants, and Count Three alleges national origin discrimination under Ohio law. Count Four alleges discrimination under 42 U.S.C. § 1981, and Count Five alleges national origin discrimination against UC under Title VI. Count Six is a claim against Dr. Amy Reed individually under 42 U.S.C. § 1983, for violating her equal protection rights based on her national origin. Defendants seek judgment on all of her claims.

## DISCUSSION

Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, ... or is not significantly probative, ... the court may grant judgment."

Anderson, 477 U.S. at 249-50 (citations omitted).

National Origin Discrimination

The state law discrimination claims under Ohio Rev. Code 4112.02 are analyzed under federal law principles that are generally applicable to all of Plaintiff's federal claims, including Title VII, Title VI, and Section 1981.  See, e.g., Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Commission, 66 Ohio St.2d 192, 196 (Ohio 1981).

A plaintiff alleging national origin discrimination may establish a claim by either direct or circumstantial evidence. Direct evidence is evidence which

> ... if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. ...  Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group. ...  The evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [national origin], but also that the employer acted on that predisposition. ...  Finally, an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action.  Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.

DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004) (internal citations and quotations omitted).

In <u>DiCarlo</u>, the plaintiff testified that his supervisor
called him a "dirty wop" and complained about too many "dirty
wops" working in plaintiff's postal facility.  The Sixth Circuit
found the statements were direct evidence of discriminatory
animus, especially because they were allegedly made within days
of the supervisor's recommendation to terminate plaintiff.  Such
phrases are not susceptible to any reasonable interpretation
other than a derogatory reference to plaintiff's Italian-American
heritage.  And in <u>Alogalli v. National Housing Corp.</u>, 743 F.Supp.
1264 (N.D. Ohio 1990), a Section 1981 and Fair Housing Act
national origin discrimination claim, plaintiff's apartment
manager told her that "people are concerned" about her and asked
her not to use the back door to a laundry room.  When plaintiff
asked why, the manager told her it was because of "the way you
dress, the way you look, you act [and] what your husband is, he
is Arabic and where he's from."  <u>Id</u>. at 1269.  The district court
found the comments were the product of discriminatory
stereotyping.

In contrast, in <u>Idemudia v. J.P. Morgan Chase</u>, 434 Fed.
Appx. 495 (6th Cir. 2011) (unpublished), the court found that a
supervisor's statement that he had once dated an African American
woman who broke up with him because he is white is not direct
evidence of discriminatory animus based on plaintiff's race or
national origin.  The fact that the supervisor made that

statement during the meeting with plaintiff in which he allegedly threatened plaintiff with demotion or discipline if he refused to apply for a lower-paying job in a different bank branch could suggest some racial animus on the part of the supervisor. But another reasonable inference was that the supervisor had told plaintiff the story about his girlfriend only after the plaintiff protested that he did not want to transfer to the different branch because "... he would stick out like a sore thumb, be like the only black man in a 100 mile radius." Id. at 500. Viewed in this context, the statement supported the inference that the supervisor was trying to show some understanding of the plaintiff's concern. Because the statement could be reasonably interpreted in different ways, it was not direct evidence of discriminatory animus.

And in Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003), the court found that a manager's statement of concern about the potentially detrimental effect on business of having an African-American co-manager was not direct evidence of discriminatory animus. The stated concern did not compel the conclusion that the supervisor subsequently sought to have plaintiff removed from the co-manager's position.

Here, Dr. Vechvitvarakul contends that Dr. Reed's statement that "it may be best for her to return to her home country of Thailand," and her contention that Dr. Reed told her she would

not "make it" in the United States, is direct evidence of discrimination. The Court must disagree, as there are several possible inferences that arise from the statement. Dr. Vechvitvarakul argues it was uttered with discriminatory intent, because Dr. Reed harbored animus towards Thais or Asians. An equally reasonable inference, as Dr. Reed described, is that Dr. Reed knew that Dr. Vechvitvarakul had practiced general surgery in Thailand and that her family was in Thailand; given her difficulties in learning vascular surgery Dr. Reed suggested that a return to her home might be a good choice. Because there are differing inferences that reasonably arise from the statement, it is not direct evidence of national origin discrimination.

Absent direct evidence, a plaintiff may establish a prima facie case based on circumstantial evidence by showing that: (1) she is a member of a protected class, (2) she suffered an adverse employment action; (3) she was qualified for her job; and (4) she was replaced by someone outside her protected class, or was treated differently than similarly-situated, non-protected employees. McDonnell-Douglas v. Green, 411 U.S. 792, 802-804 (1973). If she establishes these factors, the employer must come forward with a legitimate explanation for the adverse action. Plaintiff must then show that the explanation is mere pretext for discrimination.

There is no dispute that Dr. Vechvitvarakul satisfies the

first two prongs of a prima facie case.  Defendants dispute that
she was qualified for her position.  Dr. Vechvitvarakul responds
that the prima facie burden is not intended to be onerous, and
may be satisfied with evidence that her "qualifications are at
least equivalent to the minimum objective criteria required for
employment in the relevant field."  <u>Wexler v. White's Fine
Furniture, Inc.</u>, 317 F.3d 563, 575-576 (6th Cir. 2003).  In
assessing this prong of a prima facie case, the Court should not
consider the employer's proffered reasons for the adverse action.
Dr. Vechvitvarakul argues that she was found acceptable for
entrance into the fellowship program after an interview, as she
was "ranked" as an acceptable match.  She successfully completed
a general surgery residency and is Board Certified in general
surgery, all indications that she met the qualifications for the
position of vascular surgical fellow when she began the program.
Given that the prima facie showing of qualifications is not a
heavy one, the fact that Dr. Vechvitvarakul was interviewed and
ranked as an acceptable candidate by the UC faculty is sufficient
to find that she met the minimum requirements of the fellowship
program.

Defendants also contend that Dr. Vechvitvarakul has not
satisfied the fourth prong of her prima facie burden,
demonstrating that she was replaced by someone outside her
protected group, or that similarly-situated employees were

treated different than she was treated. Dr. Vechvitvarakul does not dispute Defendants' contention that her fellowship position remained unfilled after she was terminated, and the program did not have another first-year fellow until the next "match" year. And she concedes she lacks evidence that another similarly-situated employee was treated more favorably. She argues that the fourth prong should be relaxed because she was the only first-year fellow in her program, and given the unique nature of her position, there are no relevant comparators available. She also notes that the next first-year fellow who matched to the program was a Caucasian/American male.

The vascular surgery faculty supervised many residents who rotated through the department, and the second-year fellow when Dr. Vechvitvarakul began the program was Mexican-American. Dr. Vechvitvarakul has not shown that any of these trainees were treated differently than she on a day-to-day basis. The fact that the fellowship program accepts one fellow per year is not the sort of unique circumstance that might excuse her from some showing of disparate treatment. See, e.g., <u>Abdu-Brisson v. Delta Air Lines</u>, 239 F.3d 456, 467 (2nd Cir. 1991), where the court relaxed the disparate treatment requirement for a group of plaintiffs claiming age discrimination. The plaintiffs were former Pan Am pilots who became Delta employees after accepting Delta's offer of employment following Pan Am's bankruptcy. They

contended that Delta's implementation of the offer constituted age discrimination. The court found that due to the structure of the Pan Am buyout and the manner in which the former Pan Am pilots were hired, they were not similarly-situated to any other Delta pilots. But the court excused them from producing evidence of disparate treatment, as it was not the only way to satisfy a prima facie case. The court noted plaintiffs' evidence that the Delta management representative who evaluated the Pan Am acquisition made numerous derogatory comments about the age of the Pan Am pilots, calling them "contaminated" and "bad apples." This evidence was sufficient to satisfy the prima facie burden of raising an inference that the structure of Delta's offer may have been motivated by age-based animus. Here, in contrast, there is a lack of any evidence that any faculty member expressed any derogatory comments about Dr. Vechvitvarakul's national origin, or any other employees' national origin for that matter. And Dr. Reed's suggestion that Dr. Vechvitvarakul consider returning to Thailand is not, in the Court's view, sufficient evidence of invidious discriminatory intent that could excuse Dr. Vechvitvarakul from demonstrating some disparate treatment.

However, recognizing that a plaintiff's prima facie burden is not intended to be onerous, the Court will assume that she can satisfy this burden of proof. Defendants have provided a legitimate justification for their decision to terminate her: her

lack of clinical competence, which Dr. Meier generally described as "a combination of knowledge and application of that knowledge to the patient at hand." (Meier Dep. at 51) Dr. Vechvitvarakul argues these reasons are mere pretext for national origin discrimination. She argues the reasons have no basis in fact, because she was able to complete a surgical residency in the United States and pass her general surgery boards. She successfully passed oral and written examinations, and she has been employed at the VA Hospital in Illinois for the past several years. She also cites the testimony of Dr. Eric Campion, who was a third-year resident when Dr. Vechvitvarakul began her fellowship. Dr. Campion was able to communicate with Dr. Vechvitvarakul, and he said that language "was not an issue" with him. (Campion Dep. at 17) But Dr. Campion also testified that Dr. Vechvitvarakul was frequently not present in the morning when he and other residents would complete early rounds, and they would have to try and find her or call her. He said she was "less available than most fellows." (Id. at 12) He also said that Dr. Vechvitvarakul did not appear to him to be "as interested in what was going on with the patients," and that "her level of knowledge and involvement was less than what I had expected of a fellow." (Id. at 13-14) Dr. Campion observed her in the operating room, and her level of skill was "not of the level of what I'd expect of a surgical fellow ... her technical

abilities were not what I would have expected." (Id. at 18)  He

believed that Dr. Vechvitvarakul did not have as much medical

knowledge as he expected, saying that:

> When we would approach her with patient
> problems, I guess in general we felt that her
> suggestions as to what to do were not - not
> good - whatever she would suggest typically
> was not the plan after we talked to the
> attending; where in my experience most
> fellows have a pretty good idea of what we
> would be doing and that the plans - their
> plans would often be similar to what the
> attending would in the end want to do.

(Id. at 20)[2]  Rather than assisting Dr. Vechvitvarakul, this

testimony lends credence to Defendants' position that it was not

Dr. Vechvitvarakul's national origin or her accent that were the

problems.  Rather, it was her clinical performance, or as Dr.

Reed described, "not being able to put the information together

and say here's what needs to be done, because ... what we found

is the basic things she just couldn't come up with. ... She just

wasn't preparing. ... [M]y opinion all along has been that I

---

[2] Another resident, Dr. Parit Patel, testified that he was
concerned that she could not communicate effectively in English,
but also that she did not understand the patient's condition:
"So, for example, the attending would ask the fellow at the end
of the day or after rounds a question about the patient.  And she
would look to other team members to answer the question because
she didn't know the answer." (Patel Deposition at 26-27)  Dr.
Patel also thought she did not perform at the level he would
expect of a fellow, noting that "some of the more simple cases
that the senior residents would do, for example, angioplasty, she
had difficulty performing.  And so the attending would have to
either do it directly with her or show her how to do it."  (Id.
at 30)

think she's, as I mentioned earlier, a very intelligent and motivated individual who got in over her head in vascular surgery. And she just wasn't doing the work." (Reed Dep. at 123-124) Dr. Vechvitvarakul's arguments do not raise a genuine dispute that the Defendants lacked an honest belief that she was not performing what was expected of her in the fellowship program.

Dr. Vechvitvarakul also argues that Defendants' proffered reasons did not actually motivate her discharge. She relies on the alleged inconsistency between her performance evaluations and the objective evidence of her abilities (her written test scores and prior and subsequent employment); Dr. Meier's "grossly exaggerated testimony" about her deficiencies; Dr. Reed's statement that she would not "make it" in the United States; and her contention that Dr. Meier treated her more harshly than Dr. Rosales for substantially the same conduct, involving the care of a particular patient.

Defendants again note that objective test performance or the ability to pass the written English proficiency test for foreign medical graduates is not indicative of whether or not Dr. Vechvitvarakul was able to clinically perform as a vascular surgery fellow. The principles of general surgery and vascular surgery are, they argue, far different, and require a minimum of two additional years of training beyond a general surgery

residency. The fact that Dr. Vechvitvarakul is apparently qualified to be a general surgeon was recognized by the faculty members, and Dr. Reed specifically encouraged her to pursue that field. And in the practice of medicine, as in other learned arts, the ability to perform well on tests does not necessarily equate to an ability to evaluate or treat patients effectively. In that regard, Defendants cite <u>Sreeram v. Louisiana State Univ. Med. Center</u>, 188 F.3d 314 (5th Cir. 1999), affirming summary judgment granted to defendants in a national origin discrimination case brought by a third-year surgical resident who was terminated from the program. The resident argued that her objective qualifications and higher scores on in-service exams satisfied her burden of demonstrating she was qualified for the position. The court noted that this evidence "... addressed only her ability to perform under test conditions, and not her ability to perform under the stressful "real life" conditions of a surgical residency. ... Moreover, it is one thing to test well, quite another to perform when life is literally on the line. At issue ... was whether Dr. Sreeram had the clinical ability and confidence to apply her objective knowledge and take on increased responsibility within the fast paced realities of administering medical care to actual patients." <u>Id</u>. at 318-319. The same observation applies here at the stage of evaluating pretext.

Dr. Vechvitvarakul's evidence of Dr. Meier's "gross

exaggerations" consists of his testimony that "... almost every resident that worked with her" would not "sign out" their patients to Dr. Vechvitvarakul when she was on call, and would contact the other fellow or the attending physician in order to sign out for the evening. He said "... some of that is just bad press. You know, once you get that sort of reputation, nobody trusts you and everybody starts doing the same thing. So that's why we had to address it in some fashion or she would never be able to finish the program." (Meier Dep. at 44-45) Dr. Meier went on to say that residents at every level had complained to him and to Dr. Reed. He was asked if Dr. Campion had registered a complaint, and he responded "I would say the answer is yes." (Id. at 45-46) Dr. Campion said that he did not evaluate Dr. Vechvitvarakul's vascular surgery skills, because he wasn't "there to judge her performance." He then was asked if he ever spoke to any attending physicians about her performance, and he responded that he had not done so. (Campion Dep. at 18-19) Dr. Meier's response is not a definitive assertion that Campion had complained about his difficulties with Dr. Vechvitvarakul being on-call; and Dr. Campion's statement that he had not spoken to any physicians about her "performance" is not such a contradictory statement to what Dr. Meier expressed that a reasonable inference arises that Dr. Meier is "grossly exaggerating" his description of Dr. Vechvitvarakul's overall

difficulties in the program.

Dr. Reed's statement that Dr. Vechvitvarakul would not "make it" in the United States is too ambiguous to constitute evidence of intentional discrimination sufficient to raise a genuine issue of pretext.  And her contention that Dr. Meier treated her more harshly than Dr. Rosales (the second year fellow) is not supported by the record.  Dr. Vechvitvarakul testified that Dr. Meier was upset with her because on Thanksgiving morning, she "found a patient that was left overnight who was supposed to go to the operating room for a procedure, and that delay caused patient to lose his leg.  And [Dr. Meier] is very upset and he's blaming it on me."  (Vechvitvarakul Dep. at 114-115)  Dr. Vechvitvarakul explained that she had not been on call the prior evening, Dr. Rosales had been on call, and he was the one who did not take any further action about the patient.  But Dr. Vechvitvarakul did not know if Dr. Meier did any further investigation into the incident.  Dr. Meier testified that the issue regarding this patient was not who had been on call the previous night, but rather that when he appeared for morning rounds, Dr. Vechvitvarakul had not evaluated this patient appropriately and determined that the patient needed immediate surgery.  He said it was several hours later that they reached that patient during rounds, when he immediately recognized there was an emergency.  Dr. Meier said he discussed the problem with

her directly after the patient had been attended to, and that this was an example of her inability to accurately judge whether a patient needed immediate treatment. (Meier Dep. at 41-44) This incident is not mentioned in her evaluations, and there is no evidence that any particular discipline was imposed on Dr. Vechvitvarakul as a result. Even if Dr. Rosales failed to take some action while on call the night before, there is no evidence before the Court that he was treated differently than Dr. Vechvitvarakul as a result. Her description of the incident does not support her contention that she was treated differently than Dr. Rosales in a manner that suggests discriminatory intent.

The Court's conclusion that Dr. Vechvitvarakul has not come forward with evidence raising a triable issue of pretext is also supported by the fact that Dr. Reed and Dr. Giglia were responsible for, or at least involved in, the decision to "rank" Dr. Vechvitvarakul as an acceptable candidate for the match program. Dr. Reed personally interviewed Dr. Vechvitvarakul, as she did with all fellowship candidates, and Defendants argue that if she or other faculty members intended to discriminate against foreign-born Thai fellows, they could simply have chosen not to rank her for the match program, ensuring she would not be chosen. Dr. Vechvitvarakul responds that this "same actor" inference does not apply at the summary judgment stage, and is reserved for the trier of fact. The same actor inference is not a mandatory one,

and cannot support entry of summary judgment if an employee has otherwise raised a genuine issue of material fact about discriminatory intent. See <u>Wexler v. White's Fine Furniture</u>, 317 F.3d at 573. The Court has concluded that Dr. Vechvitvarakul had not come forward with sufficient evidence to raise a genuine factual dispute as to discriminatory intent, and the fact that Drs. Reed and Giglia were involved in ranking her for placement at UC, and then in deciding that she could not complete the program, is simply some additional evidence supporting the Court's conclusion.

After a careful review of the parties' arguments and the record, the Court concludes that Dr. Vechvitvarakul has not demonstrated a genuine factual dispute that the reason for her dismissal from the fellowship program was her national origin. Defendants are entitled to judgment on her discrimination claims under Title VII and Ohio law.

For similar reasons, the Court finds that they are entitled to judgment on her Section 1981, Section 1983, and Title VI claims, because she has not come forward with admissible evidence demonstrating that her national origin played a role in Defendants' decision not to renew her contract. And because the Court cannot conclude that Defendants violated any of her rights, Dr. Reed is entitled to immunity from her claims.

<u>Breach of Contract</u>

Dr. Vechvitvarakul alleges that Defendants breached her GME Contract because Dr. Reed failed to provide her with oral and/or written feedback on her performance, as was required under Section 4.1.2 of the GME Agreement. When a letter of deficiency is issued, the program director is required to provide the trainee with feedback about the deficiencies. If and when those deficiencies are resolved, the period in which the trainee resolves those deficiencies will not be considered to negatively affect the trainee's future career development. Dr. Vechvitvarakul argues that if Dr. Reed had held formal meetings with her in October or November and had given her more feedback about her clinical performance, she would have had a full opportunity to cure the deficiencies and complete the fellowship program. She completed the objective steps Dr. Reed listed in the deficiency letter, and she disputes the rest of the concerns stated in the letter as matters of subjective evaluation. She seeks the relief of specific performance of the contract and reinstatement to the fellowship program, and she argues that any question of tangible financial harm she may have suffered is irrelevant.

Defendants respond that Dr. Vechvitvarakul has not demonstrated that she fulfilled her own contractual obligations or suffered any damages, which she must do in order to pursue a

claim of breach.  But the Court finds that Dr. Reed's failure to hold a "formal" meeting in October and/or November is not a breach of the GME Contract's provisions regarding deficiency letters.  Section 4.1.2 of the Agreement states that once a deficiency letter has been issued, "[t]he Program Director will provide the Resident with feedback consistent with the letter of deficiency."  There is no contractual requirement that such feedback be provided in a formal meeting or session, and all of the faculty members and the two residents who were deposed describe the ongoing feedback and give-and-take between the residents, fellows and attending physicians.  While Dr. Reed's letter did state that she would meet monthly with Dr. Vechvitvarakul, it also stated that review of her performance and status would be on an "ongoing basis," and that further disciplinary actions "may occur at any time should your performance warrant such an action."  (Vechvitvarakul Ex. 15 at p. 2)  While Dr. Vechvitvarakul initially denied that she received any performance feedback at all save for the deficiency letter, she also admitted to ongoing conversations with faculty members, specifically Dr. Meier and Dr. Reed, about problems they encountered with her patient care.  She disagrees that these encounters constitute "feedback" about her "performance," but her disagreement is not enough to create a genuine issue of fact about whether Defendants breached the GME Contract because Dr.

Reed did not hold a formal meeting with her in October or November 2008.  Defendants are entitled to judgment on her breach of contract claim.

## CONCLUSION

For all of the foregoing reasons, Defendants' motion for summary judgment is granted.  Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: February 13, 2012    <u>s/Sandra S. Beckwith</u>
                                     Sandra S. Beckwith
                                     Senior United States District Judge